**M. L. PULLIAM, Plaintiff,**

v.

**BOARD OF TRUSTEES OF the HOUSTON MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants.**

**No. EC 77–9–S–O.**

United States District Court,
N. D. Mississippi, E. D.

Memorandum of Decision Dec. 27, 1979.

On Motions To Alter and For
Reconsideration Feb. 21, 1980.

Kenneth Mayfield, Tupelo, Miss., for plaintiff.

Armis E. Hawkins, Houston, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

In this action, M. L. Pulliam (hereafter "Pulliam"), a resident and citizen of Houston, Chickasaw County, Mississippi, sues the Houston Municipal Separate School District, the members of its Board of Trustees, and the school Superintendent.[1] This memorandum of decision will include the court's findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P. The action was submitted to the court at a non-jury trial held in Aberdeen, Mississippi, on November 13, 14, and 15, 1979. The parties have submitted proposed findings of fact and conclusions of law. The matter is now ripe for the court's decision.

Plaintiff is a black person and charges by his complaint and evidence introduced at trial, that defendants discriminated against him on the basis of his race with regard to employment and promotion within the district.

The evidence reflects that for the school year 1969–70, the last year in which the district operated separate schools for the races, at the district's predominately black school, the faculty consisted of 29 teachers, one white and 28 black teachers. During this school year, the other schools of the district were predominately white, with a combined faculty of 70; 69 of which were white teachers and one black teacher. The percentage of teachers in the district were 70.7% white and 29.3% black.

For the school year 1971–72, there were a total of 94 teachers in the district. Of these, 27 were black, 66 were white, and one was a Spanish American. During the year, four black teachers and 15 white teachers were employed. The new teachers brought into the system for the year, as a group, consisted of 21% black and 79% white.

For the school year 1972–73, the district employed 109 teachers. There were 28 black teachers, 80 white teachers and one was Spanish American. During the year, the district hired four black teachers and 23 white teachers. The composition of the faculty for 1972–73 was 26% black and 74% white. The teachers brought into the dis-

---

1. The defendants are herein referred to collectively as "the district".

trict during the year consisted of 15% black and 85% white teachers.

During the school year 1973–74, the district employed 97 teachers, of which 25 were black and 71 white. There was one Spanish American. The percentages were 26% black and 74% white. During the year, 14 new teachers were hired, one was a black teacher and 13 were white teachers.

During the school year 1974–75, the district employed 101 teachers. There were 25 black teachers, 75 white teachers and one Spanish American. The percentages were 25% black and 75% white. During the year, the district hired eight new teachers. All of these were white.

For the 1975–76 school year, the district employed 99 teachers. Twenty four of these were black teachers, 74 were white and one was Spanish American. During the year, the district hired 10 new teachers, one of these was black and nine were white. The new teachers constituted 10% black and 90% white. For the entire year, the faculty percentages as to race, were 24% black and 76% white.

During the school year 1976–77, the district employed 95 teachers. Of these teachers, 23 were black, 71 were white, and one was Spanish American. There were eight new teachers brought into the district for the year and all of these were members of the white race. The composition of the faculty for the 1976–77 school year was 24% black and 76% white.

During the 1977–78 school year, the district employed 97 teachers. Twenty-two of these teachers were members of the black race and 75 were white teachers. During the year, the school district hired 11 new teachers of which 10 were white and one was black. The composition of the faculty for the year 1977–78 was 77% white and 23% black.

The school district during the year 1978–79 employed 97 teachers of which 77 were white and 20 were black. During that year, 21 teachers were brought into the school district of which 19 were white and two were black. Ten percent (10%) of the new teachers were black and 90% were white. The composition of the faculty for 1978–79 was 79% white and 21% black.

For the school year 1979–80, the school district employed 100 teachers of which 79 were white and 21 were black, thus giving a percentage of 79% white and 21% black. Sixteen new teachers were brought into the district for this year. Fifteen of these teachers were members of the white race. One teacher was a member of the black race.

The summary of General Characteristics for the State of Mississippi, as shown by the 1970 Census, reflects that of all persons making up the population in Chickasaw County, Mississippi, as of 1970, 35% were members of the negro, or black race.

It is against this background of statistical information, that plaintiff presents his individual claim of racial discrimination by the district during and after the period of his employment.

The record reflects that beginning with the 1971–72 school year and continuing through the year 1975–76, plaintiff was employed by the district as a teacher of physical education in Houston Elementary School. This physical education program was funded under Title I of the Elementary and Secondary Education Act of 1965, as amended. (ESEA), 20 U.S.C. § 241a et seq.

Plaintiff was authorized to teach under the following certificates and permits:

1. Permit (Certificate) No. 050433, which began September 1, 1975, and ended August 31, 1976. By this permit, plaintiff was certified to teach in the primary and intermediate schools (Grades 1–8).

2. Certificate No. 050433, beginning September 1, 1975, and ending August 31, 1980, certifying him to teach social studies in the secondary schools (Grades 9–12).

3. Plaintiff received a certificate, No. 050433, dated June 16, 1976, certifying him to teach in the elementary school. The certificate began September 1, 1976, and ends August 31, 1981.

Plaintiff was not employed by the district for the school year 1976–77. For the year

1976–77, in addition to those teachers employed in the previous year by the district, the district employed eight new teachers. All of these were members of the white race.

For the school year 1977–78, in addition to those teachers already employed by the district, 11 new teachers were employed of which ten were members of the white race and one was a member of the black race.

The school district employed 21 additional faculty members for the year 1978–79. Nineteen of these were members of the white race, and two were members of the black race.

The school district employed 16 new teachers for the school year 1979–80. Fifteen of the new hires were white teachers, one was black.

Since the 1971–72 school year until the present time, the school district has employed in the school system 120 new or additional white teachers and 14 black teachers.

The record also reflects that the district has not employed a member of the black race as principal or assistant principal since the integration of the schools, with the exception of Warren Cousin, a black individual who was designated as an assistant principal upon the integration of the schools, and Alford Bell, a member of the black race who was employed as Director of Vocational Education for the school year 1978–79.

On July 31, 1975, the superintendent of the schools prevailed upon the State Coordinator of the Title I program in the state, to authorize the continuance of the physical education program in the elementary school of the district for the school year 1975–76. Plaintiff was the teacher who had been employed by the district to carry out this program.

In January, 1976, plaintiff was informed by Mr. Dexter Digby, Title I, ESEA Field Supervisor, that the Title I Physical Education Program for the elementary school would not be funded for the 1976–77 school year.

On February 10, 1976, Pulliam and his principal, Charles E. Parham, discussed the position of physical education teacher in the elementary school under the Title I program. Parham advised Pulliam that since this program was being terminated, he should consider making application for a teaching position in the other schools in the district.

Again, on March 1, 1976, Parham talked with Pulliam and inquired if he had made application for a position in the other schools in the district. At that time, Pulliam had not submitted an application.

The school board met on Thursday, March 4, 1976. Parham did not recommend Pulliam as a teacher of physical education in the school of which he was the principal, for the 1976–77 school year. The position had been terminated and Title I funds were not available. Pulliam was advised of this action the next day, March 5. Pulliam was also advised by Parham that he should make application for a position at the middle school or in the high school as he held a valid certificate for teaching in both schools.

The district did not comply with the provisions of Mississippi Code, Annotated, 1972 § 37–9–105, as the section existed prior to July 1, 1977.[2] The pertinent part of the section at the time here pertinent, provided:

Any employee of a school district who has been employed by such district during the entirety of the preceding school year, shall be given notice within seven (7) days of the decision that he not be offered a contract for reemployment for the succeeding school term when:

.     .     .     .     .

2. The Mississippi Public School Fair Dismissal Act (hereinafter "the 1974 Act"), Mississippi Code of 1972, Annotated, §§ 37–9–101 through 37–9–113 (Supp.1976) become effective April 25, 1974. The Act was repealed by the School Employment Procedures Law of 1977 (hereinafter the "1977 Act"), effective July 1, 1977. We are not here concerned with the 1977 Act since the rights of the parties must be determined by the 1974 Act, which was in force when Pulliam's teaching contract was not renewed for the 1976–77 school year.

(c) by April 1 the principal does not recommend to the superintendent the reemployment of a teacher . . . .

Section 37–9–107 of the Mississippi Code, 1972, amended, was in effect during the period pertinent to the action sub judice; the section, however, has been repealed by the Laws of 1977, Chapter 489, § 6 effective from and after July 1, 1977.

The section prior to the repeal thereof, is as follows:

Except in the case of nonreemployment of the superintendent, notice shall be tendered by the superintendent to any employee within seven (7) days of the date when the recommendation to reemploy would have been made under the terms of Section 37–9–15 and 37–9–17 and amendments thereto.

In the case of the superintendent who is not offered a contract for reemployment by January 15 or other date set by Section 37–9–13, Mississippi Code of 1972, the president of the board of trustees shall tender notice to such superintendent within seven (7) days of the date of the board's decision.

The notice shall be mailed by certified mail, return receipt requested.

Section 37–9–109, Mississippi Code, 1972, Annotated, in effect prior to July 1, 1977, when it was amended by Section 3, Chapter 489, Laws of 1977, states:

An employee entitled to notice under section 37–9–105 shall be entitled to:

(a) receive a written statement of the reasons that he shall not be offered a new contract with facts supportive of those reasons upon requests;

(b) request a public hearing before the board within seven (7) days after receipt of the notice;

(c) receive a fair and impartial hearing before the board within fourteen (14) days from the date of receipt of the notice from the employee requesting a hearing;

(d) be represented by legal counsel, at his own expense.

If the employee does not request a hearing, the decision of the board with regard to the reemployment of the employee shall be final.

Section 37–9–103, Mississippi Code 1972, Annotated, as it existed in The Mississippi Public School Fair Dismissal Act, was brought forward in the 1977 Act. This section provides, as follows:

As used in sections 37–9–101 through 37–9–113 the word "employee" shall include any teacher, principal, superintendent elected by a board of trustees, and other professional personnel employed by any public school district of this state and required to have a valid certificate issued by the state department of education as a prerequisite of employment.

In August, 1976, Pulliam had not been given a contract as a teacher in the elementary physical education program under Title I because funding for that position had been terminated. Pulliam then applied for a position for the school year 1976–77 on the faculty of the three schools of the district. The three schools in the district are: (1) the elementary school; (2) the middle school; and (3) the high school.

In August, 1976, Pulliam held a certificate issued by the Mississippi Department of Education enabling him to teach social studies in secondary schools (middle and high schools of the district). The certificate expires August 31, 1980. Pulliam also held a certificate qualifying him to teach in the elementary grades. This certificate was issued June 16, 1976, and was valid for the period beginning September 1, 1976, and ending August 31, 1981. Pulliam was not recommended by any school principal for a teaching position for the school year 1976–77. The recommendation by a school principal is essential to obtaining a teaching position in the elementary and secondary schools in Mississippi.

Pulliam's principal for the last year of his employment with the district was Charles E. Parham. Parham is now the principal of an Oxford, Mississippi, elementary school.

Parham talked with Pulliam on several occasions in the Spring 1976, and on each occasion advised Pulliam to make applica-

tion for a teaching position in the other schools of the district. Parham informed Pulliam that there would not be a vacancy in the elementary school of which he was principal for which he could recommend Pulliam. At that time, Pulliam had taught physical education in the elementary school on a permit issued from year to year, but did hold a certificate qualifying him to teach in the secondary schools.

Mrs. Ann P. Dexter, a teacher of Fifth Grade Mathematics in the elementary school, was selected for the principal's position upon the resignation of Parham. The principalship was effective for the school year 1976–77. On two occasions, one in July, 1976, and again on August 7, 1976, Mrs. Dexter talked with Pulliam on the campus of Mississippi State University. On each of the occasions she suggested that if Pulliam was interested in a position which was then vacant on her faculty, he should file his application. This was not done. The position was filled by Mrs. Dexter on August 15, 1976. Thereafter, on Friday, August 20, 1976, Pulliam again inquired about an opening. At this time, he was informed by Mrs. Dexter that the place had been filled; that since he did not file an application, she thought he was not interested in the position. Mrs. Dexter explained to Pulliam that they were considering employing one or two teacher's aides under the CETA physical education program. She suggested that if he was interested in the position, he should go to the unemployment office and make application for the work. Mrs. Dexter also gave him an application blank and requested that he file an up-dated application. This was done, and the application was returned to her on August 23, 1976. Mr. Pulliam was not interested in the teacher's aide position, as he considered such a position a demotion.

On January 19, 1977, Pulliam filed the action sub judice seeking reinstatement in the school district as a teacher. Because he was not given a contract for the school year 1976–77, he also sought damages against the district.

Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) and the First, Thirteenth and Fourteenth Amendments to the Constitution of the United States. It is alleged that the amount in controversy, exclusive of interest and costs, exceeds $10,000 and that the action arises under the Constitution of the United States.

Jurisdiction of this court is also invoked pursuant to the rule of pendent jurisdiction to litigate plaintiff's rights arising under §§ 37–9–105 through 37–9–113 of the Mississippi Code, 1972, annotated.

Plaintiff seeks injunctive and other equitable relief as well as a declaratory judgment that certain policies adopted by the district are on their face and/or as applied in violation of the Fourteenth Amendment to the Constitution of the United States.

At trial, the parties stipulated that for the school year 1976–77, Pulliam was not as qualified in the position he sought as Rhonda Jolly, Joyce Smith and Sylvia Womack. These were successful applicants. For that school year the evidence was directed to the selection of a Social Studies teacher in the secondary school. Pulliam, a black individual, and Gregg Peppers, a white person, were applicants for the same position. Peppers was employed. Pulliam claims he was not selected because of his race.

The parties also stipulated that for the school year 1977–78, three of the applicants for the position which Pulliam sought were better qualified for the position than Pulliam. These applicants were Charlotte Woods, Harold Luse and Paul Hurst. The applicant who succeeded in obtaining the position was Kay Holladay Pearson, a member of the white race. Pulliam charges that he was better qualified than Mrs. Pearson, and school officials did not give him the position because he was a black person.

A stipulation was entered with regard to the 1978–79 school year. The parties stipulated that Jimmy Caldwell, Nancy Orr, Kay Penick, and Donna Walker were more qualified for the position to which they were appointed than Pulliam. The only contested position for the year 1978–79, was the position for which Janice Gardner, a white

person, was selected. Pulliam claims that he was better qualified for the position in question than Janice Gardner.

The court's decision on the issues submitted at the non-jury trial, can best be treated by dealing with the pendent claim independently from the federal claim.

### The Pendent Claim

Beginning with the school year 1971–72 and continuing through the school year 1975–76, Pulliam was employed as a Title I education teacher in Elementary Education in the school district. The Title I state officials withdrew funding for the program at the end of the 1975–76 school year. Pulliam's position was terminated. As the result of the termination, Pulliam was not offered a contract to teach in the schools of the district for the succeeding year, 1976–77.

The evidence establishes the fact that Pulliam was notified orally on several occasions during the first part of the year 1976, that the position he held would be terminated at the end of the year. Pulliam was also advised by his principal that he would not have a vacancy which Pulliam could fill for the year 1976–77 and that he should contact the principals of the other schools if he wanted to continue teaching in the Houston Schools. The school officials did not give Pulliam the written notice required by Sections 37–9–105 and 37–9–107 that he would not be given a contract for the 1976–77 school year.

The school officials take the position that the decision to eliminate Pulliam's position was not theirs to make, since Title I State officials made the decision to terminate funding thereby eliminating the position. Even so, they argue that as early as January, 1976, and on several occasions thereafter, Pulliam was notified orally that the position would be eliminated for the 1976–77 years. It follows, they contend, that Pulliam was fully advised, had the opportunity of looking for another position, and was not prejudiced in any way.

They assert that a hearing before the board of trustees would not benefit Pulliam

since the board would not have any control over the decision to eliminate the position.

This argument does not answer Pulliam's contention that the district could have awarded him a contract to teach in some other position in the schools for which he was qualified.

■ In reaching a decision on the pendent state claim, the court is bound to apply the Mississippi Law. Where the State Supreme Court has spoken, the court can not ignore its mandate. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See, also, McDonald v. Mims*, 577 F.2d 951 (5th Cir. 1978).

■ The Mississippi Supreme Court has spoken in at least two cases as to the rights of a school teacher whose contract is not renewed and who qualifies for relief under the 1974 Act. *Jackson v. Board of Education of Oktibbeha County*, 349 So.2d 550 (Miss.1977); *McDonald v. East Jasper County School District*, 351 So.2d 531 (Miss.1977).

In *Jackson*, the school authorities did not give timely notice to a teacher who was entitled to the protection of the Act of their decision not to renew the teacher's contract for the succeeding year. The lower, or trial court, found that the school authorities had violated the notice provisions of the 1974 Act and ordered the board of trustees of the school to reinstate the teacher to the first available position for which the teacher was qualified and licensed. The trial court decree did not provide an award of back pay for the year of employment which the plaintiff was denied, nor did it provide for any award of attorney's fees for the teacher. There, the court said:

> The school board's contention that Jackson was not wrongfully dismissed, but that the board simply decided not to continue the drug education program and therefore there was no position for Jackson to return to is untenable. In either event—whether the board decided not to rehire Jackson or simply terminated his position—the result was the same, he was not to be reemployed for the succeeding term. Under the Act, he was entitled to

timely notice of that decision and he did not receive it.

[4] We have carefully considered appellant's contention that he is entitled to attorney's fees and are of the opinion that under the facts presented the fees are unjustified. First, the Act does not make provision for attorney's fees; and, secondly, the facts of this case created a legitimate difference of opinion as to the interpretation of the statutes involved.

The decree of the chancellor holding that complainant, Ralph R. Jackson, be reinstated as an employee of the Board of Education of Oktibbeha County is affirmed, but is modified to provide further that the appellant is entitled to the compensation that he would have received under his renewed contract for the school year 1975–1976, and this cause is remanded for the chancellor to conduct such proceedings as are necessary to determine the amount of compensation owing to the appellant by the Board of Education of Oktibbeha County, Mississippi, under that contract.

Chief Justice Patterson held in *McDonald*, that the 1974 Act requires mandatory compliance with its notice provisions, 351 So.2d at 532. There, the school board argued, as the board does here, that the teacher had knowledge of facts which put him on notice, but Chief Justice Patterson held that *Jackson, supra,* dictated mandatory compliance.

In the action sub judice, the school district admits that it did not comply with the mandate of the statutes. Under such circumstances, the decisions of the Mississippi Supreme Court dictate that Pulliam is entitled to relief on his state cause of action.

The provision of the opinion in *Jackson* when applied to the action sub judice requires a judgment for the amount which Pulliam would have earned as a teacher in the Houston Schools during the year 1976–77, less such amounts as he was able to earn from other sources, and to reinstatement in the school system for the school year 1980–81, at such a position as he is qualified and certified to hold.

■ Pulliam was advised by the principal of the Elementary School that the school had openings for the 1976–77 school year for teacher aides. He was informed that he should apply for one of the positions through the unemployment office if interested. As the job was a demotion in scholastic work, and the remuneration was much less than he would earn as a teacher, Pulliam declined to seek the work. Under the circumstances prevailing, the court cannot find that he should be penalized for seeking other employment.[3]

The records of the Mississippi Employment Security Commission reflect that from May 29, 1977, to date, Pulliam has been paid unemployment benefits amounting to $3,040.00. Since none of these payments were made during the school year in question—1977—the school district is not entitled to credit for any portion of this sum on the amount due Pulliam for the school year 1976–77.

Pulliam testified, however, that he collected unemployment benefits at the rate of $80.00 per week, for four or five months, beginning in October, 1976. The court finds that the school district is entitled to credit against the amount due Pulliam as account of the payments received by him in the sum of $1600.00 ($80.00 per week for 20 weeks).

The evidence reflects that Pulliam was able to earn $650 during the balance of 1976, and $750 during 1977. Pulliam should be charged with aggregate earnings of $1400, for the year 1976–77.

The record reflects Pulliam's salary for the year 1975–76 to have been $9300. Using this as a basis to compute the amount due Pulliam on his state claim, the court finds the amount to be $6300 ($9300, less $1400, and $1600). This amount should draw interest at 8% per annum from July 1,

---

**3.** The evidence reflects that Pulliam made application for employment as a teacher in several other schools in the area. The court holds that his decision to forego an application for employment as a "teacher's aide" was not unreasonable under the circumstances.

1977 (the end of the school year 1976–77) until paid.

■ There is no statutory basis for the allowance of attorney's fees on the state claim. Section 1988, Title 42, U.S.C., does not apply to the state action here involved; neither does section 718 of the Emergency School and Act, 20 U.S.C. § 1617.

In order to allow an attorney fee for plaintiff in prosecuting his state claim, a finding by the court that the school district acted in bad faith would be essential. The rule is stated in *Alyeska Pipeline Service Co. v. Wilderness Society* (1975), 421 U.S. 240, 258, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141, 154, as "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'", a court may assess attorney fees. *See also* the quotation, *supra*, from *Jackson v. Bd. of Ed. of Oktibbeha County.*

The facts in the case sub judice do not justify an award of attorney's fees on the state claim.

### The Federal Claim

■ The initial burden is cast upon plaintiff to establish, by a preponderance of the evidence, the right to recover damages and/or injunctive relief from defendants on account of a violation of his federal rights.

The rule enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is here applicable.

In *McDonnell Douglas* the court said:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants

from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824.

■ Pulliam has carried the initial burden of establishing a prima facie case of racial discrimination. An inference can reasonably be made from the statistical evidence that the school district has engaged in racial discrimination in the employment of members of its faculty.

At the time of the establishment of the unitary system, when the segregated schools were combined, all students in every grade were housed on one campus. The district inherited from the segregated schools a faculty of 99 teachers, 29 of which were black, and 70 white, roughly a 30% to 70% ratio. Since that time, the district has employed 120 white teachers and 14 black teachers, and presently has 100 teachers, of which 79 are white and 21 are black, or a ratio of 21% black and 79% white. Additionally, the district has never employed a black principal, with the exception that for the year 1978–79, a black person was engaged as the Director of Vocational training. The only black assistant principal during this period has been Warren Cousin. He had been reassigned to a teacher's position, when the assistant principalship, which he held, was terminated. Those who are charged with the responsibility of a hiring new personnel, throughout the pertinent period, have been white.

Pulliam, a member of a racial minority applied for teaching positions within the district for which he was qualified. White applicants were selected and Pulliam was rejected.

■ The establishment of a prima facie case of racial discrimination by Pulliam shifts the burden to the school district "to articulate some legitimate, nondiscriminatory reason for (Pulliam's) rejection." *McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824.

The question resolves itself into whether the school district has articulated some nondiscriminatory reason for rejecting Pulliam's application for a teacher's position in the school years 1976–77; 1977–78; 1978–79. The district concedes that Pulliam was

qualified by certification for the position sought, but seeks to justify its rejection of Pulliam on the ground that the successful applicant was better qualified, and that the district owed a duty to its students to select the best qualified person. There can not be any reasonable argument that the district's position, if supported by the preponderance of the evidence, is not well taken.

### The 1976–77 Application

█ Pulliam and Gregg Peppers, a white individual, were applicants for the position in the high school of teacher of social studies. Pepper was the successful applicant.

The evidence shows that both applicants were equally qualified by certification and otherwise for the position. Pulliam had held the physical education teacher's position in the Elementary School for the preceding year. Pepper had not been employed by the district. The district assigned the teacher in this position the additional duties of assistant football coach. Pulliam had not had any experience in coaching football. He had never played football. For the two years preceding the 1976–77 school year, Pepper was connected with the Cleveland, Mississippi, High School as teacher and assistant football coach. He had also played football in prior years.

The court finds that the evidence supports the district's position that Pulliam was not the victim of racial discrimination when rejected in favor of Pepper for 1976–77 position as a teacher of social studies in the high school and assistant football coach, or in reaching the decisions that Pepper was the best qualified applicant for the position.

### The 1977–78 Application

Pulliam and Kay Holladay Pearson, a member of the white race, were applicants for the same position for the 1977–78 school year. Mrs. Pearson was selected. Pulliam was rejected.

Mrs. Anne Dexter was the principal of the elementary school at the time the applications of Pulliam and Mrs. Pearson were considered for employment.

Pulliam's application had been filed with her on August 23, 1976. Mrs. Pearson's application was received on October 31, 1977. The application reflects that Mrs. Pearson would graduate from Mississippi State University for Women on December 16, 1977, at which time she would receive her certificate from the State Board of Education, authorizing her to teach in the elementary schools of the state. Mrs. Pearson came highly recommended by those with whom she had been associated in her practice teaching and others with whom she was well acquainted. Based upon a personal interview with Mrs. Pearson, the scholastic record which she presented, and the recommendations received, Mrs. Dexter judged her to be better qualified for the position than Pulliam. Mrs. Dexter recommended Mrs. Pearson's employment. The board approved the appointment on December 5, 1977, and the contract was awarded on January 3, 1978.

From the evidence presented the court cannot find that the decision by Mrs. Dexter to award the position to Mrs. Pearson instead of Pulliam was racially motivated, but rather, the decision was made in good faith, in an effort to obtain the best qualified person for the position.

### The 1978–79 Application

Gerald Hegan was the principal of the middle school for the year 1978–79.

Sometime in the summer of 1978, Hegan was called upon to select a teacher to replace Ms. Sherry Carr, a white person, who taught sixth grade science and art in the middle school. Hegan selected Ms. Janice Gardner because he thought she was better qualified for the position. The record reflects that Pulliam was qualified to teach social studies, but had no training or experience in teaching science.

Pulliam was considered by Hegan for the position, but Hegan concluded the school children would be better served by employing Mrs. Gardner. Hegan testified that race did not play any part in his selection.

The court finds that the district has shown by the evidence introduced that Hegan's selection was not racially motivated.

## CONCLUSION

The court concludes that Pulliam must fail in the action on his federal claims of racial discrimination, but is entitled to relief on his state claim.

The clerk is directed to enter a final judgment that plaintiff, M. L. Pulliam, recover of defendant, Houston Municipal Separate School District, the sum of $6,300.00 with interest at the rate of 8% per annum from July 1, 1977, until paid and his cost of action. Plaintiff Pulliam is not entitled to recover any sum from the individual defendants, or any of them. The judgment will run only against the school district.

The court will enter an order granting plaintiff the injunctive relief to which he is entitled pursuant to this memorandum.

## MEMORANDUM OF DECISION

### On Motions To Alter and For Reconsideration

The action sub judice is before the court on defendants' motion to alter or amend findings and judgment of the court, and upon plaintiff's motion for reconsideration of judgment.

After having considered the motions and memoranda submitted by the parties in relation thereto, the court has determined, with the exceptions hereinafter provided, that the motions are not well taken and should be denied.

A. *The Injunctive Relief.*

■ The court's injunctive order required defendants to offer plaintiff a contract for any teaching position in the school system for which he held certification and was qualified to hold for the school year 1980–81.

Plaintiff's motion for reconsideration of the judgment proposes that the order should be supplemented to provide that plaintiff be offered the next vacancy for which he is certified and qualified to fill, in the event there is no available position for the school year 1980–81.

The court finds that plaintiff is entitled to this relief. Accordingly, the injunctive order shall be amended as proposed by plaintiff.

B. *The Amount of Monetary Recovery— $6300.*

Plaintiff questions the court's decision to charge plaintiff with the sum of $1600.00, against his loss of salary for the school year 1976–77 amounting to $9300.00, and requests that the amount be added to the court's award of $6300, thus making the total recovery $7900.00.

The $1600.00 item represents unemployment compensation which the court found on the evidence introduced at the trial, to have been received by plaintiff during the school year 1976–77, being compensation for 20 weeks at $80.00 per week.

Plaintiff reminds the court that an agreement was reached at trial that the State Employment Service might present its certificate as to earnings, which would be binding on both parties. The certificate, later furnished the court, did not contain a report as to any payments made during the 1976–77 school year. Plaintiff had testified at trial that during this period he had drawn unemployment benefits for four or five months at $80.00 per week.

The evidence reflects that the unemployment services' record of payments did not include any payments made prior to May 29, 1977.

The court finds that its original holding is correct in this regard.

Defendants contend that plaintiff should be charged with the sum of $4,450.00 which the evidence reflects he could have earned as a teacher's aide during the 1976–77 school year, but which he failed to earn because he refused the position.

The evidence did not reflect that plaintiff was actually offered this position. The principal of the school at which plaintiff made application for a teaching position too late to be considered for the position testified she informed plaintiff that two positions for the year as teacher aides were open and suggested he apply for one of the

**12**

positions at the unemployment office. This evidence falls short of an actual offer of employment.

In this regard, the court considered plaintiff's testimony that he considered the position as a demotion, and desired to seek a position in line with his certification at other area schools. The court did not fault plaintiff for his action, and held the same to be a reasonable attempt by him to secure other work for which he was qualified.

The court finds defendants' argument in this regard to be without merit.

The court's original memorandum answers defendants' other arguments for reconsideration and entry of an amended order.

## CONCLUSION

The court will amend its injunctive order in compliance with the holding herein and will enter an order overruling both motions for relief against the judgment entered for monetary recovery.